J-S32025-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DENNIS FULTON | : | |
| | : | |
| Appellant | : | No. 2913 EDA 2018 |

Appeal from the PCRA Order Entered September 27, 2018
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0003414-2014

BEFORE: SHOGAN, J., NICHOLS, J., and MURRAY, J.

MEMORANDUM BY NICHOLS, J.:                     **FILED JULY 23, 2019**

Appellant Dennis Fulton appeals from the order dismissing his timely first Post Conviction Relief Act[1] (PCRA) petition. On appeal, Appellant contends the PCRA court erred by denying his request for an extension of time to file an amended PCRA petition. Appellant also claims the PCRA court should have held an evidentiary hearing on his claim that trial counsel was ineffective by failing to interview and call six witnesses. We affirm.

We adopt the facts as quoted in a prior decision of this Court:

On February 7, 2008, Aisha Evans purchased a Smith & Wesson Model 10 .38 Special revolver, serial number D424759, for the father of her children, [Appellant]. Evans purchased the revolver for [Appellant] because he could not buy the gun himself.

Prior to the murder, the decedent Rudolph Wilkerson, a 61 year-old neighborhood "hack driver," provided several unlicensed taxi

_____

[1] 42 Pa.C.S. §§ 9541-9546.

rides to [Appellant], Evans, and several others living in the neighborhood. During one hack ride, the decedent allegedly flirted with Evans, which greatly upset [Appellant].

On June 17, 2010, the decedent purchased thirty bundles of heroin from Frank Johnson, Jr., a drug dealer who occasionally employed the decedent. Edwin Castro, the decedent's neighbor, later observed the decedent transport the heroin in his green 1993 Ford Explorer.

On June 18, 2010, the evening of the murder, the decedent and Roger Aye, the decedent's close friend, socialized and smoked crack cocaine in the decedent's home. While using a "star 67" prefix to conceal his phone number, [Appellant] called the decedent three times between 11 p.m. and 11:34 p.m. and received no response. Once [Appellant] called the decedent from his unconcealed number, the decedent immediately returned [Appellant's] call and arranged to pick up [Appellant]. As he was leaving his home, the decedent told Aye that he needed to pick up a "young boy," referring to [Appellant], near Sixth Street and Emily Street. The decedent never returned home.

At 12:33 a.m. on June 19, 2010, Officers Brian Egrie and James Bragg responded to a radio call for an unresponsive male lying on the highway near 16 E. Wolf Street and discovered the decedent lying in a pool of blood. At 12:51 a.m., medics pronounced the decedent dead at the scene.

At approximately 1 a.m. on June 19, auto mechanic John Pilotti observed the decedent's vehicle illegally parked near the intersection of Seventh and Morris Streets, and called a towing service the next morning. That morning, Sergeant Kevin Cannon and Officer Melissa Curcio secured the vehicle and observed interior and exterior bloodstains.

At trial, Dr. Gary Collins, [then the] Philadelphia Deputy Medical Examiner and an expert in forensic pathology, testified that the decedent suffered fatal, penetrating gunshot wounds to the back left of the head and the right shoulder. The decedent further suffered a fatal perforating gunshot wound to the central chest, a non-fatal, perforating gunshot wound to the mouth, and graze wound behind the right ear. The gunshot wound to the decedent's central chest exhibited a dense stipple pattern indicative of a contact wound. The trajectory of the decedent's back left head

- 2 -

and right shoulder gunshot wounds were consistent with shots fired from above and in front of a kneeling decedent. Dr. Collins concluded, to a reasonable degree of scientific certainty, that the cause of death was homicide by multiple gunshot wounds. Two bullets were recovered from the decedent and turned over to the Philadelphia Police Department Homicide Unit.

On July 8, 2010, Officer Jacqueline Davis of the Philadelphia Crime Scene Unit searched the decedent's vehicle and observed a bullet hole in the driver's seat and recovered projectiles from the rear driver's side door and the driver's side seat belt column. Officer Brian Stark, an expert in blood splatter analysis, examined the bloodstains in the vehicle and observed downward flowing bloodstains on the passenger side front door that exhibited significant blood smear. Blood stains on the dashboard and center console indicated that the decedent crawled across the front passenger seat before opening the door. Officer Stark further observed heavier volume drops on the interior panel between the front and rear passenger door, which flowed downward towards the street below.

Officer Stark examined two bloodstains on the highway outside of 16 E. Wolf Street, marked bloodstains A and B. Bloodstain A exhibited a passive droplet pattern and indicated no movement from the blood source, consistent with blood flow from the passenger side door. Bloodstain B, located eleven feet east of bloodstain A, indicated heavy blood flow from the decedent's mouth and demonstrated that the decedent crawled west to east along Wolf Street after escaping the truck, smearing blood across the pavement. Blood accumulation on the decedent's shoes, legs and shirt exhibit a pattern consistent to wiping or smearing bloodstain B. The decedent's body laid in a pool of blood six feet away from Bloodstain B.

Officer Ronald Weitman of the Firearms Investigation Unit, a ballistics expert, concluded that all four bullets recovered in this matter were .38/.357 caliber and exhibited "five right twist" rifling markings. Officer Weitman concluded that each bullet was fired from the same weapon. At trial, Officer Weitman testified that all Smith & Wesson Model 10 .38 Special revolvers left "five right" markings on their respective bullets. In 2013, Officer Weitman examined the Smith & Wesson Model 10 revolver belonging to [Appellant] and determined that the weapon fired .38 caliber bullets exhibiting "five right" rifling characteristics. Due to

- 3 -

corrosion and wear on the weapon's barrel, test firing the weapon produced insufficient microscopic bullet markings to determine whether the recovered projectiles were fired from [Appellant's] gun.

On August 7, 2010, Detective Kenneth Rossiter interviewed Aye, who stated that he left the decedent's home at approximately 7 a.m. the morning after the murder. As he travelled home, Frank Johnson Sr., a neighborhood drug dealer and Johnson Jr.'s father, told Aye that the decedent was murdered over 30 bundles of heroin. Aye said that, the day before the shooting, Castro saw the decedent transport the heroin in his green Ford Explorer.

Detective Rossiter recovered the decedent's cell phone and discovered that [Appellant's] 267–271–6664 number was the last call to the decedent's phone. In the hour prior to the shooting, three calls were made from [Appellant's] phone to the decedent's phone using a "star 67" prefix to conceal the number's identity. The records further revealed that an unconcealed fourth call was made from [Appellant's] phone at 11:34 p.m., and that a return call was made two minutes later.

On August 13, 2010, Detectives Rossiter and Nordo interviewed [Appellant], who confirmed that the 267-271-6664 number belonged to him. [Appellant] claimed that his cousin, Shaku Maven, called the decedent from his phone on the night of the murder. At trial, Maven testified that he did not use [Appellant's] phone on the night of the murder, as he was in Darby at that time.

Two days after his interview with detectives, [Appellant] told his cousin Norman Whitest that police knew that he was the last one to call the decedent and the last person in the decedent's car. [Appellant] told Whitest that he called the decedent for a ride to Evans' home and that he was worried that Maven gave detectives his name. At around the same time period, [Appellant] told Evans that he killed the decedent because he needed the money and stole cash from him.

Tazmin Willis, [Appellant's] close friend, was incarcerated at the time of the decedent's murder. Upon his release in the summer of 2010, Willis moved into [Appellant's] home at 604 Emily Street. There, [Appellant] told Willis that he murdered the decedent because the decedent had disrespected Evans earlier that

- 4 -

summer. [Appellant] implored Willis not to tell the decedent's son that [Appellant] murdered his father.

On January 8, 2013, Willis provided a statement about the instant matter to state and federal authorities in exchange for a downward departure on his pending federal robbery and firearms charges. During the interview, Willis repeated [Appellant's] confession and stated that [Appellant] habitually carried a silver Smith & Wesson revolver.

On March 6, 2013, Special Agent Mangold of the Pennsylvania Attorney General's Office interviewed [Appellant], whereupon [Appellant] stated that Evans purchased a Smith & Wesson Model 10 revolver, serial number D424759 on his behalf. [Appellant] told Special Agent Mangold that someone stole the weapon prior to the interview.

On November 17, 2013, Philadelphia police arrested Carlton Wright and recovered the silver Smith & Wesson Model 10 revolver, serial number D424759, which previously belonged to [Appellant].

*Commonwealth v. Fulton*, 3791 EDA 2015, 2016 WL 7219708, *4-*7 (Pa. Super. filed Dec. 13, 2016) (unpublished mem.) (footnotes and citations omitted).

Appellant was arrested and tried by a jury.

At Appellant's trial, significant circumstantial evidence was presented, including telephone records revealing several telephone calls from Appellant's cell phone to [the decedent's] cell phone shortly before the murder, and testimony indicating that in 2008 Aisha Evans, the mother of Appellant's two children, purchased a Smith and Wesson revolver—consistent with the murder weapon—for Appellant and did so in his name because he was ineligible to be licensed. Evans and [Willis] indicated that Appellant confessed to the murder, telling Evans he needed money and telling another witness that he was angry because Wilkerson "disrespected" Evans.

*Id.* at \*1.  The jury convicted Appellant, and the trial court sentenced him to "an aggregate sentence of life imprisonment without parole plus eight to sixteen years."  *Id.*  This Court affirmed on direct appeal, *see id.*, and the Pennsylvania Supreme Court denied Appellant's petition for allowance of appeal on May 15, 2017.  *Commonwealth v. Fulton*, 169 A.3d 523 (Pa. 2017).

On January 29, 2018, Appellant filed a timely *pro se* PCRA petition.  The PCRA court appointed James Berardinelli, Esq., as PCRA counsel.  Attorney Berardinelli filed an amended PCRA petition claiming that Appellant's trial counsel was ineffective by failing to object to the admission of the cell phone records.  Am. PCRA Pet., 5/8/18, at ¶ 14.  Appellant's petition did not request an evidentiary hearing or include any witness certifications.  The Commonwealth filed a motion to dismiss.

On June 21, 2018, the PCRA court issued a Pa.R.Crim.P. 907 notice of intent to dismiss indicating that Appellant's issue lacked merit.  Appellant filed a *pro se* response to the Rule 907 notice requesting a *Grazier*[2] hearing.  The PCRA court held a *Grazier* hearing on July 30, 2018, at which time Appellant requested that Attorney Berardinelli file an amended PCRA petition alleging trial counsel was ineffective by failing to call six witnesses: Marcia Fulton (Appellant's mother), Derrick Whitest, Norman Whitest, Aisha Evans, Edwin

---

[2] *Commonwealth v. Grazier*, 713 A.2d 81 (Pa. 1998).

Castro, and Tasha James. Suppl. to Appellant's PCRA Pet., 9/19/18, at 1-2.

Attorney Berardinelli requested, and was granted, an extension of time to file

a supplement to the PCRA petition. Order, 8/30/18.

On September 19, 2018, Attorney Berardinelli filed a supplement to the

PCRA petition, stating as follows:

> 4. First, [Appellant's] trial counsel, Daniel Conner, has indicated that he was not provided with the names of any witnesses before trial. (See Exhibit A). This is consistent with [Appellant's] own testimony under oath at trial. (N.T. 11/2/15, p. 13, 11/5/15, p. 130).

> 5. [Appellant's] mother, Marcia Fulton, indicates that Aisha Evans did purchase the murder weapon in question, but that she was forced to say that it was purchased for [Appellant]. She further relates that [Appellant] possessed a similar weapon that was stolen before the murder. (See Exhibit B). This testimony, however, would have been irrelevant since it in no way refuted [Appellant's] potential access to the murder weapon in question.

> 6. [Appellant's] investigator has made repeated efforts to interview Norman Whitest, Derrick Whitest, Aisha Evans, Edwin Castro and Tasha James but has received no response from any of those individuals (See Exhibit C). Further, Norman Whitest and Aisha Evans actually testified as a witnesses at trial. (N.T. 11/3/15, pgs. 165-187; 11/4/15, pgs. 151-219).

Suppl. to Appellant's PCRA Pet., 9/19/18, at 1-2. Attorney Berardinelli's

supplement to the PCRA petition essentially stated that Appellant's additional

claims lacked merit.

At some point—the record does not specify when—Attorney Berardinelli

advised the PCRA court that Appellant wished to proceed *pro se* on appeal,

which prompted the court to schedule a hearing for the morning of September

27, 2018. On September 26, 2018, Lauren Wimmer, Esq., entered her

appearance as Appellant's counsel, but Attorney Berardinelli had not yet requested permission to withdraw.

On September 27, 2018, shortly after 9:53 a.m., the PCRA court granted the Commonwealth's previously filed motion to dismiss Appellant's PCRA petition. Order, 9/27/18. The order also formally dismissed Attorney Berardinelli as PCRA counsel and appointed Attorney Wimmer as Appellant's appellate counsel.[3] *Id.*

Later that morning, the PCRA court held a hearing to address Appellant's request to proceed *pro se* on appeal.

> THE COURT: . . . Now, it is my understanding that counsel, who will identify herself in a moment, has appeared this morning seeking -- well, I'll make certain that that's right -- to enter her appearance. So, first of all, Counsel, can you identify yourself for the record.
>
> MS. WIMMER: Good morning, Your [H]onor. Lauren Wimmer. So the record is clear, I received a call from [Appellant's] mother last night, Marcia Fulton, seeking to retain my law firm for the filing of a, I suppose, a supplemental amended petition. In my speaking with her before I officially confirm that I've been retained, I did enter my appearance, just so there was no confusion. But it's my hope to be granted at least 45 days, so that I could thoroughly review the file, speak with Mr. Fulton in an attorney-client call, and then determine whether further filings need to be made.
>
> THE COURT: Well, Counsel, since the petition is dismissed, I think the question is, is whether or not you wish to enter your appearance for appeal. I mean, we reviewed it, I dismissed it. It was actually filed this morning, and before I came into this hearing, because court opens early, we of course did not receive

---

[3] The court later filed another order permitting Attorney Berardinelli to withdraw and appointing Attorney Wimmer as Appellant's appellate counsel.

any application for a continuance, nor did we receive any entry, which we wouldn't until at least 24 hours after someone files something. So I guess the question I have for you is -- well, what you're telling me is you know nothing about the case. So, you really can't be prepared to argue that there is a necessity for me to reconsider the dismissal.

MS. WIMMER: That's correct, Your Honor.

THE COURT: I have counsel that I have given several continuances, and it was my intent, I think as I already articulated, just to see whether or not [Appellant] wanted to represent himself on appeal given the history of the case. And I did not colloquy or ask Mr. Berardinelli any information.

As soon as he said that he thought it was appropriate, and he is available, if either side thought there was a need for him to testify today that I should, in abundance of caution, speak with [Appellant].

So, you know, Counsel, you always have options available to you, but at this point, the petition is dismissed. So, let me -- I guess I should ask [Appellant] some questions to see whether or not he wishes to retain you -- to continue to retain you, because he is entitled to counsel of his choice. But at this point I don't see any reason to vacate my order to dismiss.

N.T. Hr'g, 9/27/18, at 4-6.

The PCRA court then questioned Appellant about whether he wished to represent himself *pro se* or have Attorney Wimmer represent him. Appellant did not object to Attorney Wimmer's representation. The PCRA court then removed Attorney Berardinelli as counsel and formally appointed Attorney Wimmer as Appellant's appellate counsel.[4] *Id.* at 11-12. The PCRA court also

---

[4] We add that the PCRA court, Appellant, and Attorney Wimmer discussed the status of her representation because she had not yet been paid. N.T. Hr'g,

- 9 -

explained its reasoning for dismissing Appellant's PCRA petition earlier that morning, including the claims raised in Attorney Berardinelli's supplemental petition. *Id.* at 6-7 ("So, after reviewing [the supplemental petition], I made the decision that there was nothing -- that there was no relevant information that counsel could present on your behalf; so, dismissed your petition").[5]

Appellant filed a timely notice of appeal. The PCRA court did not order Appellant to comply with Pa.R.A.P. 1925(b). Appellant raises two issues on appeal:

> [1.] Whether the PCRA court erred in denying Appellant's request for an extension of time to file an amended PCRA petition.
>
> [2.] Whether the PCRA court erred in denying Appellant's PCRA petition without an evidentiary hearing where Appellant raised genuine issues of material fact concerning trial counsel's failure to call witnesses.

Appellant's Brief at 3.

Attorney Wimmer first argues that the PCRA court abused its discretion by denying her request for a forty-five day continuance to speak with Appellant and file an amended PCRA petition. *Id.* at 9. Attorney Wimmer contends that the PCRA court should have given her at least a week to review

---

9/27/18, at 8-11. As a result of that discussion, because Attorney Wimmer was on the list of attorneys that could be appointed by the PCRA court, the PCRA court appointed Attorney Wimmer as Appellant's appellate counsel, and Appellant agreed. *Id.* at 11.

[5] The PCRA court also noted that Attorney Wimmer should not have entered her appearance before she was formally retained. N.T. Hr'g, 9/27/18, at 7.

- 10 -

the record. *Id.* Based on her subsequent review of the record, Attorney Wimmer claims she has identified two meritorious ineffective assistance of counsel claims. *Id.*

"The decision to grant a continuance is within the sound discretion of the trial court, and we will reverse only if the court has abused its discretion." *Commonwealth v. Paddy*, 15 A.3d 431, 470 (Pa. 2011) (citations omitted). Initially, the PCRA court had already dismissed Appellant's petition earlier that morning—before Attorney Wimmer orally requested a forty-five day extension of time. *See* N.T. Hr'g, 9/27/18, at 4-6. Regardless, Attorney Wimmer, who was not formally retained as private counsel, declined to argue that the PCRA court should reconsider its dismissal. *See id.* Therefore, under the circumstances, we cannot hold that the PCRA court abused its discretion by denying Attorney Wimmer an extension of time to file an amended petition. *See Paddy*, 15 A.3d at 470.

Appellant next argues that trial counsel was ineffective by failing to interview and call Norman Whitest, Derrick Whitest, Aisha Evans, Edwin Castro, and Tasha James. Appellant acknowledges that a private detective interviewed Marcia Fulton, Appellant's mother. According to the private detective, Appellant's mother said she spoke with Appellant's trial counsel prior to trial and gave counsel a list of names that included at least Edwin Castro and Tasha James. Appellant adds that the private detective

interviewed trial counsel who denied that Appellant's mother gave him any names of witnesses to interview or call for trial.

We briefly state the applicable standard of review before summarizing Appellant's arguments.

> This Court's standard of review regarding an order denying a petition under the PCRA is whether the determination of the PCRA court is supported by the evidence of record and is free of legal error. The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record.

***Commonwealth v. Grayson***, \_\_\_ A.3d \_\_\_, 2019 WL 2417016, *3 (Pa. Super. 2019) (citation omitted). Where, as here, the PCRA court has dismissed a petition without an evidentiary hearing, we review the PCRA court's decision for an abuse of discretion. ***See Commonwealth v. Roney***, 79 A.3d 595, 603 (Pa. 2013). Pursuant to Rule 907, a PCRA court has discretion to dismiss a PCRA petition without a hearing if the court is satisfied that there are no genuine issues concerning any material fact, that the defendant is not entitled to post-conviction collateral relief, and that no legitimate purpose would be served by further proceedings. ***See*** Pa.R.Crim.P. 907(1); ***Roney***, 79 A.3d at 604.

We are guided by the following: it is presumed that the petitioner's counsel was effective, unless the petitioner proves otherwise. ***Commonwealth v. Williams***, 732 A.2d 1167, 1177 (Pa. 1999). Our

Supreme Court has adopted the **Strickland**[6] performance and prejudice test into a three-part inquiry. **See Commonwealth v. Pierce**, 527 A.2d 973, 975–77 (Pa. 1987). Thus, to succeed on a claim of ineffective assistance of counsel, a petitioner must demonstrate (1) that the underlying claim is of arguable merit; (2) that counsel's performance lacked a reasonable basis; and (3) that the ineffectiveness of counsel caused the appellant prejudice. **Commonwealth v. Washington**, 927 A.2d 586, 594 (Pa. 2007). A claim of ineffectiveness will be denied if the petitioner's evidence fails to satisfy any one of these prongs. **Id.**

> Neglecting to call a witness differs from failing to investigate a witness in a subtle but important way. The failure to investigate presents an issue of arguable merit where the record demonstrates that counsel did not perform an investigation. It can be unreasonable *per se* to conduct no investigation into known witnesses. Importantly, a petitioner still must demonstrate prejudice. To demonstrate prejudice where the allegation is the failure to interview a witness, the petitioner must show that there is a reasonable probability that the testimony the witness would have provided would have led to a different outcome at trial.
>
> In this respect, a failure to investigate and interview a witness claim overlaps with declining to call a witness since the petitioner must prove: (i) the witness existed; (ii) the witness was available to testify; (iii) counsel knew of, or should have known of, the existence of the witness; (iv) the witness was willing to testify; and (v) the absence of the testimony was so prejudicial as to have denied the defendant a fair trial.

---

[6] **Strickland v. Washington**, 466 U.S. 668 (1984).

*Commonwealth v. Pander*, 100 A.3d 626, 638-39 (Pa. Super. 2014) (*en banc*) (citations and quotation marks omitted); *accord Commonwealth v. Sneed*, 45 A.3d 1096, 1108-09 (Pa. 2012) (citations omitted).

Initially, Appellant arguably waived this claim. Appellant's supplement to the PCRA petition essentially stated that Appellant's claim lacked merit. *See* Suppl. to Appellant's PCRA Pet., 9/19/18, at 1-2. Regardless, even if Appellant properly raised and preserved this claim, it lacks merit as to witnesses Norman Whitest and Evans, as they actually testified at trial. *See, e.g.*, N.T. Trial, 11/3/15, at 165-87; N.T. Trial, 11/4/15, at 151-219.

Moreover, Appellant failed to establish that trial counsel was aware of any of the remaining witnesses, let alone that they were available and willing to testify. *See* N.T. Trial, 11/2/15, at 13 (Appellant stating at beginning of trial that he had no witnesses to present on his behalf); N.T. Trial, 11/5/15, at 130 (Appellant's trial counsel stating at end of trial, that although he called a police officer as a witness during Appellant's case-in-chief, he had no other witnesses to present); *Pander*, 100 A.3d at 638-39.

Similarly, Appellant has not established that Marcia Fulton's testimony would have led to a different outcome at trial given, among other evidence, Appellant's confession to Evans and Willis. *See Fulton*, 2016 WL 7219708 at *6. Since Appellant has not established trial counsel was ineffective, *see Williams*, 732 A.2d at 1177, we discern no error in the PCRA court's denial

- 14 -

of Appellant's PCRA petition. **_See Grayson_**, \_\_\_ A.3d at \_\_\_, 2019 WL 2417016 at *3.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/23/19